1          UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF FLORIDA
2          CASE NO:15-21229-civ-ALTONAGA/O'SULLIVAN

3    ──────────────────────────────────────────

4    RAMON ORTEGA,
     and all others similarly
5    situated under 29 USC 216 (B),

6
                    Plaintiff,
7
                    -vs-
8
     BEL FUSE, INC., ARRAY CONNECTOR
9    CORPORATION, BILL MCPHERSON,

10

11                  Defendants.
                                          \
12   ──────────────────────────────────────────

13

14   AT:          300 71 Street
                  Suite 605
15                Miami Beach, Florida 33141
                  Wednesday, September 2, 2015
16                10:55 a.m.

17

18     DEPOSITION OF LETICIA BARO AND CARLOS FANABRIA

19

20          Taken before Rochel Albert, CSR and Notary

21   Public in and for the State of Florida at Large,

22   pursuant to Notice of Taking Deposition filed in the

23   above cause.

24

25     DEPO EXPRESS REPORTING, INC. (305) 305-3333

APPEARANCES:

    ELIZABETH HUEBER, Esq.
    LAW OFFICES OF J.H. ZIDELL
    300 71st Street, Suite 605
    Miami Beach, Florida  33141
    Attorney for Plaintiff


    MARY BETH RICKE, Esq.
    HINSHAW CULBERTSON
    One East Broward Boulevard, Suite 1010
    Fort Lauderdale, Florida  33301
    Attorney for Defendant


    STEPHANIE CAGNET MYRON, Esq.
    101 North Point Park West
    Palm Beach, Florida 33407-1914
    Attorney for Defendant

I N D E X

WITNESS                    EXAMINATION  BY          PAGE

LETICIA BARO      MS. HUEBER  ............   3
CARLOS FANABRIA
                  MS. RICKE...............  58
                  MS. CAGNET-MYRON..........60

EXHIBITS FOR IDENTIFICATION                        PAGE


A - Notice of Taking Deposition                      4

B - Array Connector Corporation Job                 30

    Description

C - Answer                                          53

```
 1              LETICIA BARO & CARLOS FANABRIA,
 2              were first duly sworn by the court
 3              reporter, and they testified as follows:
 4                      EXAMINATION
 5   BY MS. HUEBER:
 6       Q     Could you please state your name for the
 7   record?
 8             ANSWER BY MS. BARO:
 9       A     Leticia Baro.
10       Q     And you, sir?
11             ANSWER BY MR. FANABRIA:
12       A     Carlos Fanabria.
13       Q     So we are here on a corporate
14   representative deposition, and I want to
15   understand the subjects that you will both be here
16   testifying on.
17             Leticia, have you had your deposition
18   taken before?
19             ANSWER BY MS. BARO:
20       A     Very long, long time ago.
21       Q     Was it about your company or was it about
22   something personal?
23       A     Personal.
24       Q     Okay.  And you, Carlos?
25             ANSWER BY MR. FANABRIA:
```

1       A       Yes.

2       Q       Was it about your company or about

3    something?

4               ANSWER BY MR. FANABRIA:

5       A       Company.

6       Q       You are aware that you two are under oath

7    here today, and that we need to make a clear

8    record as much as we possibly can.  So we need to

9    avoid talking, essentially, at the same time.  I

10   have a bad habit of talking quickly that I have

11   gotten in trouble for in the past, reasonably.

12              So we are going to try to make sure that

13   the court reporter's job is not overly burdened

14   today.  So anything that needs to be said, it

15   needs to be audible in a sense that it can be

16   recorded.  "Uh-huh"s are a little tough.  So I

17   prefer "yes" or "no."

18              So I want to ask today who is here for

19   what.  I am going to be passing you a document

20   that was sent.  I want to ask you if you have seen

21   it before.  It's a Notice of Taking Deposition.  I

22   am going to label it as Exhibit A.  I am not sure.

23              (Plaintiff's Exhibit Number

24        A was marked by the court reporter and is

25        attached to the end of the transcript.)

5

```
 1        Q    I want to ask you, Leticia, have you seen
 2   this before?
 3             ANSWER BY MS. BARO:
 4        A    This, I have.
 5        Q    Okay.  Did you prepare in any way for
 6   this -- strike that.
 7             What parts of this are you here on behalf
 8   of the corporation Bel Fuse for?
 9        A    Personnel files, hiring, wages.  That
10   covers payroll.
11        Q    Is that all?
12        A    That is all.
13        Q    And Carlos?
14             ANSWER BY MR. FANABRIA:
15        A    Supervisor and daily activities.
16        Q    I do want to be a little bit more
17   specific.  I am going to ask particular questions
18   about this.
19             Who here is to talk about the means and
20   manner of Defendant Bel Fuse, Inc.'s acquisition
21   of Array Connector Corporation?
22             ANSWER BY MS. BARO:
23        A    The means and manner?
24        Q    Uh-huh.  It's the third line down on the
25   Notice of Taking Deposition.  Which one of you is
```

1  here for that?

2      A    Regarding what acquisition?

3      Q    The acquisition of Array Connector

4  Corporation.  Are you here to testify about that?

5      A    Well, what questions regarding the

6  acquisition?  I am here pretty much to testify

7  regarding his personnel, his payroll.

8      Q    Okay.  So Carlos, are you here to testify

9  about Bel Fuse, Inc.'s acquisition of Array

10  Connector Corporation?

11          ANSWER BY MR. FANABRIA:

12      A    No.

13      Q    Carlos, would you be here to testify about

14  the assignment of plaintiff's schedules and work?

15      A    Yes.

16      Q    Who would be here for the maintenance and

17  recording of plaintiff's hours?  Is there anyone

18  here for that?

19      A    I am here.

20      Q    Can you say that one more time?

21      A    I am here regarding his hours.

22      Q    Okay.  I'm sorry.  Thank you.

23          I am going to ask you general questions

24  about Bel Fuse, Inc., and whoever can answer them,

25  I would appreciate that.  What exactly is Bel

1    Fuse, Inc.?  What do they do?

2        A    They produce items in the electronics

3    industry.

4        Q    What types of products?

5        A    On our side, circular connectors.

6        Q    Can you tell me exactly what that is?  I

7    am a little bit tech oriented, but I can tell you

8    I don't have any idea, other than this case, what

9    that would mean.

10       A    We produce connectors for different

11   industries, mainly aerospace.  But we produce also

12   for transportation and some other markets.  We

13   produce connectors, electrical connectors, that

14   allow harnesses to interconnect items in the

15   industry.

16       Q    Okay.  These are components of products

17   that are created by the company?

18       A    Correct.

19       Q    So your customers would be other

20   manufacturers; is that correct?

21       A    Other users.

22       Q    Other users?

23       A    End users.

24       Q    Who would be your end users that you

25   would --

1   A    An example, Boeing.

2   Q    So Bel Fuse, your customers would be

3   people from around the world; would that be

4   correct?

5   A    Correct.

6   Q    What would be the type of product that a

7   circular connector would be used in?

8   A    In-flight entertainment, instruments,

9   passenger service units and aviation.

10  Q    Carlos, what would be your job title?

11  A    Director of operations.

12  Q    Okay.  What does that job entail?

13  A    I am tasked to maintain and produce the

14  product according to customer demands in the most

15  efficient manner.

16  Q    Do you manage employees at Bel Fuse?

17  A    Employees of Cinch Connectivity Solutions.

18  Q    Can you tell me what that is?

19  A    The company where I work is called Cinch

20  Connectivity Solutions.

21  Q    What type of employees do you manage?

22  A    We have manufacturing production assembly

23  people, maintenance personnel, machine shop

24  personnel, engineers, accounting, planning, and

25  purchasing agents.

1    Q    Now, Cinch Connectivity Solutions, is that
2    a part of Bel Fuse?
3    A    Yes.
4    Q    Is it like a subsidiary?
5    A    I would say it's a part of the Bel
6    umbrella.
7    Q    Do you know about how the relationship
8    is -- I am just trying to understand if Cinch
9    Connectivity Solutions is like a trademark brand
10   name or is it owned by Bel Fuse, like what the
11   connection is.
12   A    Cinch Connectivity is owned by Bel Fuse.
13   Q    Okay.  And question for you, Leticia.
14   What is your job title with Bel Fuse?
15        ANSWER BY MS. BARO:
16   A    Pretty much HR and finance.  I do accounts
17   receivable, payroll.
18   Q    What is it that you do?  You just do
19   general human resources?
20   A    General.
21   Q    Do you have any employees?
22   A    How many employees did you say?
23   Q    Well, the question is if you have any.
24   A    Do I have employees?
25   Q    Yes.

1        A    Under me you mean?

2        Q    Directly under you.

3        A    No.

4        Q    So is there a particular region on that

5    you do HR for?

6        A    Just for Cinch Connectivity.

7        Q    And that would be what regions?  Is that a

8    local?

9        A    Right here in Miami.

10       Q    When did Cinch Connectivity begin?

11       A    Well, when did Bel acquire Array?

12       Q    That would be my next question.  Do you

13   know when the company was created in general?

14       A    Yes.  In August of 2013.

15       Q    What is Bel Fuse?

16       A    The August.

17       Q    When was it created before?

18       A    Array?

19       Q    Uh-huh.  I am trying to understand.  Is

20   Array the same company as Cinch?

21       A    Yes.

22       Q    How did they change -- why did the name

23   change from Array to Cinch?

24       A    Do you know that one, Carlos?

25            ANSWER BY MR. FANABRIA:  The company was

1    purchased in like probably six months.  I think

2    about six months later we became Cinch

3    Connectivity Solution.  Maybe a little bit more,

4    but we were Array Connector Corporation, and we

5    were purchased, and the product we do fall under

6    Cinch Connectivity Solutions because we are part

7    of the inner connect business.

8        Q    Okay.  Was the name change of Array

9    Connector Corporation or do you understand or do

10   you know how the process of how Array Connector

11   Corporation became Cinch?

12       A    Not really.

13       Q    Okay.  Was it essentially seamless from

14   your perspective in the sense that nothing changed

15   but the name?

16       A    The way I see it, correct.

17       Q    And you would agree with that?

18            ANSWER BY MS. BARO:  I would agree, yes, I

19   believe we are just a DBA pretty much, doing

20   business as.

21       Q    I want to ask about this change when Bel

22   Fuse purchased Array.  Were there any changes in

23   the way that business was done other than the

24   ownership change?

25            ANSWER BY MR. FANABRIA:  In my opinion,

1    no.  I continue being able to be director of

2    corporation.

3          MS. CAGNET-MYRON:  I just want to form a

4    type of objection.  Your opinion as an individual

5    or as a representative of the corporation, because

6    I want it to be very specific for the record

7    whenever he says "my opinion." If it's his

8    individual opinion, because the deposition is only

9    as to the corporate representative.  To keep the

10   testimony to the corporate representative

11   position.

12         MS. HUEBER:  That is a reasonable

13   objection, and I am not going to have any problems

14   with it.  One of the issues that, just for the

15   record as well, I have here, there is no one here

16   to talk about this, this carryover.  That is one

17   of the issues that we have for successor

18   liability.

19         MS. CAGNET-MYRON:  I do have a question to

20   direct towards Leticia.  I was going to do it at

21   the end, but it might help clarify at this point.

22   It is going directly towards what you --

23         MS. HUEBER:  You can ask whatever

24   questions that you want to ask.  I am not going to

25   stop you.  We have got testimony here saying that

1   there's not someone here to answer questions about

2   that.  That may need to be something that we need

3   to address later.  But that is the explanation why

4   I asked the question this way.

5        MS. CAGNET-MYRON:  I can clear it and we

6   have do have a representative.  Leticia --

7        MS. HUEBER:  Can we just go oft record for

8   a moment?

9        (A break was taken.)

10  BY MS. HUEBER:

11     Q    Let's talk about -- we will get back to

12  these types of questions in a little bit.  Let's

13  talk about Mr. Ortega.  What did he do with your

14  company?

15       ANSWER BY MR. FANABRIA:  To me.  He was

16  the network administrator.

17     Q    What exactly does that mean?

18     A    He supported and was tasked to run all the

19  I.T. needs and I.T. requirements.  And he was as

20  well as in his job description, engineer.  Network

21  administrator/engineer.

22     Q    So what I.T. means and what an engineer is

23  a pretty broad definition.  I am really trying to

24  understand what exactly his job duties were when

25  he worked at the company Bel Fuse.  Can you give

1    me some details about things that he would have

2    done, his job duties?

3        A    He supported the server to make sure that

4    it was always up for the network, it was always 24

5    hours running, the network tried to minimize the

6    downtime of the network.  He was tasked to fix

7    problems, install hardware and software.  Test

8    software for improvement.  As well as develop

9    programs for users.  So he developed information

10   and reports that were taken from the business.

11       Q    You say you did stuff with the network.

12   What does that mean in particular?  What would he

13   physically be doing to help with the network?

14       A    Make sure that all the users were running

15   as much as possible.  Make sure that the system

16   was running all the time.

17       Q    That's a goldmine of tasks that I think.

18   What exactly would this task be?  Would he be

19   repairing the physical servers?

20       A    Yes.

21       Q    Would he be replacing the computer

22   components?

23       A    Yes.

24       Q    Would he be troubleshooting the actual

25   software itself?

1    A    Yes.

2    Q    Would he be helping the end user's clients

3    in addition -- let me rephrase that.

4         Is it a server relationship that they

5    would have at Bel Fuse?

6    A    With Bel Fuse?

7    Q    Sorry.  The company that we are here for

8    is Bel Fuse you are a representative of.  What

9    type of internal network are we talking about?

10   A    The operating system.

11   Q    Was there a central server distributing to

12   client computers?

13   A    Yes.  To the people in Cinch Connectivity

14   Miami.

15   Q    So my question then is would Mr. Ortega

16   repair both the server side of things as well as

17   the client side of things?

18   A    I would say yes, that was probably his

19   main task to make sure that that system was

20   operating.

21   Q    So that would be everything associated

22   with that?

23   A    With the server, everything associated

24   with the network system.

25   Q    Okay.  Did he have any one that helped him

1    do that task?

2        A    There was a time when he had somebody.

3        Q    Could you explain?

4        A    He had a person that worked with him to

5    make sure that the system was maintained right.

6        Q    Was it a co-worker?  Was it his

7    subordinate?

8        A    Subordinate.

9        Q    When was this?

10       A    I came back.  I was here in 2011.  And the

11   person was already there, but the person left

12   before Array Connector was sold.

13       Q    So they left before the acquisition?

14       A    Correct.

15            MS. CAGNET-MYRON:  I am going to object to

16   form.

17       Q    My understanding is he left before 2012 in

18   August?

19       A    Correct.

20            MS. CAGNET-MYRON:  Object to form.

21       Q    Do you remember his name?

22       A    Yes.

23       Q    Please tell me.

24       A    Jaime Reyes.

25       Q    And what were Mr. Reyez's other job

1   duties?

2     A   Assist Ramon and Ramon delegated duties to

3   him to perform.

4     Q   So is it correct then that Mr. Reyes was

5   Ramon's direct subordinate?

6     A   Yes.

7     Q   No one else was giving him tasks?

8     A   Me sometimes.

9     Q   So you would sometimes give Mr. Reyez

10  tasks to do?

11     A   Yes.

12     Q   Who else would give Mr. Reyez tasks to do?

13     A   There could be requests made to him.  But

14  Ramon is the one that decided if Reyez could do it

15  or do this now or do this later.  Same with me.

16  When I give Reyez something, I always do it

17  through Ramon.

18       (A discussion was held off the record.)

19     Q   Let me ask this.  But Ramon did not have

20  any employees after Mr. Reyez, did he?

21     A   Correct.

22     Q   So did he have anyone else that would

23  share the duties of maintenance?

24     A   Him and Jaime.

25     Q   During the period of after the acquisition

 1    by Bel Fuse, he did not have any co-workers doing

 2    his job nor any employees; is that correct?

 3        A    No, he didn't.

 4        Q    Earlier you mentioned that you would fix

 5    problems and install software.  Can you articulate

 6    particularly what that means?

 7        A    For example, Excel software, Word

 8    software, depending on users, each one got to be

 9    installed in the system.  So if a new employee

10    comes in or something, he will configure that

11    computer to make sure the computer was for the end

12    user according to the end user's requirements or

13    the end user's job responsibility.

14        Q    Would it be fair to say that Ramon would

15    prepare the computers for the other employees to

16    do their jobs?

17        A    Correct.

18        Q    Would he generally prepare pretty much

19    everything associated with that user's computer?

20        A    Correct.

21        Q    Is this kind of like install some programs

22    in a set way or does this require any particular

23    knowledge on behalf of Mr. Ortega?

24        A    Correct.

25        Q    Which one?

1    A    He would install everything associated
2  with software as well as hardware for the end user
3  as well as for the company operating process.
4    Q    I used to build computers from scratch.
5  Is that something Mr. Ortega would do like install
6  the mother board and that kind of thing, or did he
7  get a computer from another source?
8    A    We usually buy the computer new and that
9  computer comes with basic stuff and then according
10  to the end user you install the different software
11  and applications that were needed.
12    Q    Can you give me an example of a couple end
13  users, what their jobs would be?
14    A    Say a purchasing agent.  A purchasing
15  agent needs to buy parts according to our demand
16  generated by ERB system.  You get an order, order
17  is entered into the system, the system works on a
18  part number that is going to be delivered.  That
19  part number has individual sub components in it.
20  those sub components could be either purchased or
21  fabricated.  If they are fabricated, that's
22  eternal control because we make them in house.  If
23  it's a purchased item, you can acquire them from
24  different suppliers around the world.
25        When the system generated that demand, the

```
 1      person in purchasing needs to be able to extract
 2      that demand and say, okay, I need to go to this
 3      place and buy this component or I need to go to
 4      this supplier and order this component, and I need
 5      to make sure that that component matches the end
 6      date for delivery.
 7          Q    For this person's job, if I may
 8      paraphrase, they would be managing the purchasers
 9      of the products that you would eventually put
10      together?
11          A    Of the components to put together the end
12      product.
13          Q    What was the name?
14          A    This person would be --
15          Q    This hypothetical person.
16          A    A purchasing agent.
17          Q    For this purchasing agent, if they ever
18      had a problem with their software, would they go
19      to --
20               MS. CAGNET-MYRON:  Object to form.
21          A    To Ramon.
22          Q    Would any other employee, if they had any
23      problems with their computer or software, they
24      would go to Ramon too?
25          A    Correct.
```

1    Q    You said something about developed

2    programs for users.  Could you go into more detail

3    about that?

4    A    Something about?

5    Q    I think you said develop programs for

6    users.

7    A    Sometimes you need summary reports.  That

8    is where system information technology come into

9    place.  I am one as the director of operations I

10   wanted to know how many hours each department

11   spent on a job.  I want to know a summary.  How

12   many payroll hours I pay for manufacturing.  How

13   much I pay for molding group.  Instead of going

14   individual at my level I want summary, bottom

15   line.

16        So he developed a program, and I access

17   from my desktop and put what I want with different

18   parameters and summary comes out instead of me

19   going individually to do something.  He extracts

20   all that from the operating system.

21   Q    Okay.  What was the source of this data

22   that you are talking about here?  Where would this

23   come from?

24   A    From the operating system.  People on

25   every job they got to clock the task.  Every job

1   is divided in different tasks to perform to

2   complete the end product.  There's manual

3   assembly.  There's machine operation.  There's

4   different operations that you got to go through to

5   complete the product.  So each operation is given

6   a task of time.

7        Say you need half hour to do this, at the

8   end of the month I want to know if the person did

9   it in half hour or the person did it in 45

10  minutes.  So I develop variances to see where do I

11  concentrate my efforts to make sure that the

12  person is working to the expectation.

13       So I draw those reports, and those reports

14  were created by Ramon.  Then I go and use the

15  summary to decide what course of action I am

16  taking next.

17    Q    That sounds kind of like it's an Excel

18  spreadsheet.

19    A    That is what he does at the end, but he

20  extracts it from the system, and all comes down to

21  a summary report, which is the part of the I.T.

22  that most people end users need, summaries.

23  People on my level.

24    Q    I am trying -- from what I gathered from

25  what you have told me, we are taking data that is

1   prepared by the other employees of Bel Fuse; is

2   that correct?

3       A    Data accumulated into the system, yes.

4       Q    And it's about -- this example in

5   particular you are talking about it's the time

6   spend on different tasks?

7       A    At this time is particular labor time.

8       Q    For this particular task, I am trying -- I

9   know it's a little bit difficult.  To go step by

10  step.  The employees would put their data into

11  what program?  You said operating system.  I

12  presume there's a program.

13      A    The software called Visual.

14      Q    Visual?  Do you know who makes that

15  software?

16      A    That is the trade name I know.

17      Q    What does Visual do?

18      A    Visual tracks everything to perform the

19  business from labor to purchase items to

20  completion of products, sales history, customer

21  history, supplier history.

22      Q    This program Visual I understand will then

23  produce the reports?

24      A    Visual produce reports, but in the

25  individual user format that needs to be

1    transferred to usually Excel or the PDF.

2        Q    And that would be -- would that be Ramon's

3    job?

4        A    Yes, that was Ramon's job.

5        Q    He would take the data from Visual and

6    convert it to an Excel?

7        A    Correct.

8        Q    And this Excel spreadsheet or PDF is based

9    on your parameters?

10       A    Right.  You tell him what you want or what

11   you want it to see in the result, and he goes and

12   develops that program.

13       Q    When you say programming, you are

14   referring to being able to reformat the data to

15   your parameters?

16       A    Correct.

17       Q    It's not actually like C Plus Plus, or

18   something with a source code?

19       A    I would not know what he would use to do

20   that.  That is not my background.

21       Q    I think programming can mean a lot of

22   things to different people.  I am trying to

23   understand what you mean when you say that.  Were

24   there any other tasks that you would qualify as

25   programming that Mr. Ortega was doing?

1     A     That is what I call programming.

2     Q     Taking the data from Visual and moving it

3  into a different data file that you would use,

4  that is the extent of what you meant when you said

5  he did programming?

6     A     Correct.

7     Q     Was there anything else that Mr. Ortega

8  would do in his job duties?

9     A     Basically, that was his function, support

10  the network and provide programs or reports for

11  the user.

12     Q     Okay.  Do you know when Mr. Ortega started

13  working?

14     A     When I came to the company, he was already

15  there.

16     Q     As a company in general, do we know the

17  time that Mr. Ortega started working for either

18  for Array or Bel Fuse?

19           ANSWER BY MS. BARO:  I believe it was in

20  2001.

21           MS. CAGNET-MYRON:  Object to form.

22     Q     When did he start?

23           ANSWER BY MS. BARO:  With the company?

24     Q     Uh-huh.

25           MS. CAGNET-MYRON:  Object to form.

1    Q    You need to still tell me the answer.

2    A    Yes, it was March of 2014.

3    Q    How much was he paid at the end in March

4    of 2014?  Before when I said quit, I meant leaving

5    the company.

6    A    His annual pay, which was the amount you

7    want to know the amount?

8    Q    Yes.

9    A    55,000.

10    Q    Do you know when -- let me rephrase that.

11    Moving backwards in time, were there any changes

12    to his pay structure?

13        MS. CAGNET-MYRON:  Object to form.

14    A    Meaning was he making less?

15    Q    Was there a period where he made more,

16    made less, commissions.  I just want to understand

17    exactly the particular letters of exactly how much

18    Mr. Ortega was paid?

19    A    Yes.  He was in the prior years he was

20    making less money.

21    Q    Do you know the details about the times he

22    made less money?

23    A    The detail meaning why or just I know that

24    he has been given since he has been with Array in

25    2001, he was always given periodic raises.

1        MS. CAGNET-MYRON:  If I could -- can you

2   direct me to the specific area?  It says within

3   the relevant period, and it's my knowledge that is

4   from 2013 when the acquisition occurred.  If you

5   could just limit it to the questions as they were

6   directed in the actual notice.

7        MS. HUEBER:  Right.  I stated the relevant

8   period in a subsequent e-mail, not in the notice

9   for the record.  I don't mind doing that.  Which

10  time period do you want to set this as?

11       MS. CAGNET-MYRON:  They are testifying on

12  behalf of Bel Fuse which would be post

13  acquisition.  Anything after the August 2013 is

14  the relevant period because they are corporate

15  representatives that are here as corporate

16  representatives of Bel Fuse.  If we could just

17  limit it to that time period.  Because that is the

18  relevant time period as to Bel Fuse.

19  Q     Okay.  I believe there is data before that

20  is relevant.  I am going to ask questions about

21  it.  Feel free to object.  To the extent I

22  recognize and understand the limitations of the

23  people here.

24       So as of August of 2013, what was

25  Mr. Ortega's rate of pay?

```
 1              ANSWER BY MS. BARO:  Fifty-five.
 2      Q    So throughout from the time that Bel Fuse
 3   ran Array it was $55,000?
 4      A    Yes.
 5      Q    And this was his only method of
 6   compensation?
 7      A    With the company, yes.
 8      Q    That is a what I meant.  There was no
 9   commissions?
10      A    No.
11      Q    Did the company have any information about
12   commissions being promised to Mr. Ortega at any
13   point in time?
14              MS. CAGNET-MYRON:  Object to form.
15      A    Any record of it being promised?
16      Q    That's correct.
17      A    No.
18      Q    When Array was acquired, was Bel Fuse
19   provided with personnel files from Array?
20      A    No.
21      Q    You said you don't know or --
22      A    They were not, no.
23      Q    Were there any documents provided about
24   employees of Array at all?
25              MS. CAGNET-MYRON:  Object to form.
```

1    A    Any documents provided?

2    Q    Yes.

3    A    Meaning?  What type of documents?

4    Q    Let me take a step back.  How was Array

5   acquired by Bel Fuse?

6    A    It was a stock purchase.

7    Q    In terms of the process of how this

8   happened as I understand that Mr. McPherson sold

9   Array to Bel Fuse; is that correct?

10         MS. CAGNET-MYRON:  Object to form.

11    Q    In August of 2013 this was the date or the

12   time period where the stock purchase of Array

13   occurred; is that correct?

14    A    That's correct.

15    Q    Did McPherson provide any personnel files

16   to the company Bel Fuse?

17         MS. RICKE:  Object to form.

18         MS. CAGNET-MYRON:  Object to form.

19    A    To my knowledge, no.

20    Q    I want to pass another exhibit over.  I

21   guess we are Exhibit B.

22         (A break was taken.)

23    Q    I just marked as Exhibit B, a document

24   entitled Array Connector Corporation Job

25   Description.  I have enough for both of you.

1      MS. CAGNET-MYRON:  Thank you.

2          (Plaintiff's Exhibit Number

3      B was marked by the court reporter and is

4      attached to the end of the transcript.)

5   Q    If I am not mistaken this you that

6   document that you actually took out of your folder

7   a moment ago?

8          ANSWER BY MR. FANABRIA:  Yes.

9   Q    Is that one and the same that as Exhibit B

10  that note up above?

11         ANSWER BY MR. FANABRIA:  Yes.

12  Q    Either one can answer this, do you know

13  what this document is?

14         ANSWER BY MS. BARO:  Other than a job

15  description, that is what it is a job description.

16  Q    Do you know where it came from?

17  A    From Array.

18         MS. CAGNET-MYRON:  If I could object.  I

19  guess the rule of completeness.  If it can just be

20  specified for the record this is a one-page

21  document of the job description, and I believe the

22  entirety of the job description is more than one

23  page.

24         MS. HUEBER:  Actually, I might have been

25  mistaken on my part.  If you don't mind and if

1    counsel doesn't object, I will just copy if it's

2    the same document.

3          ANSWER BY MS. BARO:  It's the same

4    document.

5          MS. CAGNET-MYRON:  I just want to make

6    sure there's no notes.

7          MS. HUEBER:  Okay.  Go off the record if

8    you don't mind.

9          MS. CAGNET-MYRON:  I have no objection if

10    you want to copy that.

11          MS. RICKE:  Can I see that.

12          MS. HUEBER:  Back on the record.  I would

13    like the record to reflect that I have copied what

14    I had as Exhibit B which was attached, the second

15    page of the document that was provided by Carlos.

16  BY MS. HUEBER:

17      Q   Do you as the company, either you, know

18    what this document -- where it came from?

19          ANSWER BY MR. FANABRIA:  Me.

20      Q   You made this personally?

21      A   In conjunction with Mr. Ramon and

22    Mr. McPherson.

23      Q   Can you tell me how this was created?

24      A   How.

25      Q   Where the information came from?

1       A       In conversation with Ramon, McPherson and

2   people from the operating system.

3       Q       Could you tell me what this document is?

4       A       This document describe Ramon's main duties

5   and responsibilities.

6       Q       Do you remember when this was prepared?

7       A       Back in 2003.

8       Q       Since 2013, let me rephrase this.  Were

9   these -- does this document accurately reflect

10  Mr. Ortega's job duty?

11      A       Yes.

12      Q       Does it reflect what Mr. Ortega's job

13  duties was when he was with Bel Fuse?

14      A       Yes.

15      Q       Going through this now if you don't mind

16  take taking a moment to look at it.  Can you tell

17  me if any of these were not his job duties at the

18  time period of acquisition by Bel Fuse?

19      A       All his duties were his duties.

20      Q       Looking to the second page here, do you

21  see the second portion says qualifications.  Does

22  that adequately represent the qualification of

23  Mr. Ortega's job?

24      A       Yes.

25      Q       Hypothetically if you were to replace

1    Mr. Ortega, would these be the qualifications you

2    would request?

3            MS. CAGNET-MYRON:  Object to the form.

4            MS. RICKE:  Form.

5    A    Yes.

6    Q    Being that it's in 2003, that is about ten

7    years since the acquisition of Bel Fuse, would

8    that have changed the qualification job duties

9    during the times that Mr. Ortega worked at Bel

10   Fuse?

11           MS. CAGNET-MYRON:  Object to form.

12   A    No.

13   Q    So it would be the same dispute there

14   being a ten-year time difference?

15   A    Correct.

16   Q    Prior to the purchase of Array by Bel

17   Fuse, when I say that, I am referring to just

18   potentially the day before it, was there any

19   commissions that were owed by Mr. Ortega?

20           MS. CAGNET-MYRON:  Object to form.

21           MS. RICKE:  Object to form.

22           ANSWER BY MR. FANABRIA:  I don't know.

23   Q    Is the company aware of any commissions

24   system to Mr. Ortega?

25           MS. CAGNET-MYRON:  Object to form.

```
1              MS. RICKE:  Object to form.
2      A    I don't know.
3      Q    I understand earlier my recollection that
4  $55,000 per year was the annual salary.  Were
5  there any hourly requirements Mr. Ortega?
6      A    Any?
7      Q    Hourly requirements by Mr. Ortega.
8      A    What does that mean?
9      Q    Was he required to work 40 hours a week?
10      A    He had to work the schedule.
11      Q    What was his schedule?
12      A    7:00 to 4:00.
13      Q    Did he have to work outside of those hours
14  any time?
15      A    No.
16      Q    So he was never given -- what if he
17  couldn't complete a task before 4:00?
18              MS. CAGNET-MYRON:  Objection.
19      A    Not complete it.  If he couldn't finish
20  it, he couldn't finish it.
21      Q    Would he start again the next day?
22      A    I would assume so.
23      Q    Did Mr. Ortega generally work those hours?
24      A    Pretty much.  He usually there was a
25  period in which he needed to travel in conjunction
```

35

1   carpooling, so sometimes he needs to leave at 3:30

2   or 3:45 or something like that.

3       Q    But generally he would stay from 7:00 to

4   4:00?

5       A    Pretty much.

6       Q    I believe for this period of time you said

7   he would leave early to do carpool.  What period

8   of time was this, do you recall?

9       A    I would say the last two years of

10  employment.

11      Q    Are you aware of any time that Mr. Ortega

12  worked from home?

13      A    Any time he worked from home?  Yes.

14      Q    When would he work from home, do you know?

15      A    When, I don't know.  I am aware that he

16  did, yes.

17      Q    Did the company ever ask him to do any

18  work?

19      A    No.

20      Q    Why was he working from home?  Why would

21  he be working from home?

22      A    He was the network administrator.

23      Q    Well, that statement has some

24  implications, but I want to understand what you

25  mean by that.  Are you saying that because of his

1    job duties, he would need to work from home

2    sometimes?

3        A    No.

4        Q    Could you explain what you mean by that?

5        A    He had remote access like I did.

6        Q    So he was capable of working from home?

7        A    Yes.

8        Q    But he didn't have to work from home?

9        A    Correct.

10       Q    Do you have any record or knowledge of any

11   work that he would have done essentially outside

12   of the office hours?

13       A    I had some knowledge on certain occasions.

14       Q    Okay.  Where would this knowledge come

15   from?  Did he tell you?

16       A    I was working in the system in the office,

17   and sometimes I get a call from him that said get

18   off the system.  I need to do something.  It will

19   be like five minutes.  I get off.  He calls me

20   back.  I am done.

21       Q    This would be when you were working after

22   4:00?

23       A    Right.

24       Q    What would happen --

25       A    Mostly, not working after 4:00.  Working

37

1   on a salary.

2       Q    You would be at the office a lot?

3       A    I live in the house.

4       Q    I feel you.

5       A    I live there.

6       Q    Essentially, the company would not know if

7   Mr. Ortega was working after hours, would that be

8   correct?

9       A    I would not know.  I don't know if the

10  company would know, but I would not know.

11      Q    Do you have any knowledge?

12           ANSWER BY MS. BARO:  No, I would not know.

13      Q    What happened if somebody -- let me ask

14  this.  Were there a lot of other employees that

15  would be working outside the 7:00 to 4:00 hours?

16           ANSWER BY MR. FANABRIA:  That was his

17  schedule.  Not everybody else's schedule.

18      Q    Can you maybe explain that in general

19  terms essentially like were there a lot of -- what

20  was the normal office hours for the facility?

21      A    We open at 7:00, and the last group

22  leaves -- there are was at night two shifts.  But

23  then after the acquisition, it was only we leave

24  at 6:00.

25      Q    The second shift.  Can you explain what

1    their hours were?

2    A    Previously was until 11:00.  After the

3    acquisition people start at 7:00, some people

4    start at 8:00, some people start at 9:00 and we

5    provide coverage until 6:00.

6    Q    When you say that, do you mean that

7    generally people would be working eight hours?

8    A    8:00 to 5:00.

9    Q    8:00 to 5:00 and sometimes 9:00 to 6:00?

10   A    Yes.

11   Q    After the acquisition there weren't too

12   many people staying after 6:00?

13   A    Correct.

14   Q    It would just be you; is that correct?

15   A    Yes.

16   Q    Personally?

17   A    Personally.

18   Q    But most employees would leaves at 6:00;

19   is that correct?

20   A    Yes.

21   Q    Before the acquisition that was different,

22   could you explain?

23        MS. CAGNET-MYRON:  Object to form.

24   A    There was a time before the acquisition in

25   which the company had two shifts.  There was

1    people that come at 3:30 and they leave about

2    11:30.

3        Q    Okay.  What would happen -- let's go back

4    to the time with Bel Fuse when people were leaving

5    around 6:00.  What would happen if something went

6    wrong at 5:30, 4:00 someone's computer and their

7    connections to network?

8        A    I did not experience much of that.  If

9    something happened, you put a request.

10       Q    Let's go back to this process.  How

11   someone would fix a network problem because we

12   were earlier talking about that what Mr. Ortega

13   would do.  If someone had a problem that they

14   needed Mr. Ortega's help for, how would they go

15   about to let Mr. Ortega know that there was

16   problem?

17            MS. CAGNET-MYRON:  Object to form.

18       A    If there was a need to call, we call him.

19   No need for that.

20       Q    What do you mean?

21       A    Say you got a problem at 5:00, 5:30.  You

22   are going to go home at 6:00 anyway.  You wait for

23   tomorrow.

24       Q    I understand the company policy then was

25   to -- you would just need to wait for Mr. Ortega

1    to return?

2        A    Yes.  Wait for the next day.

3        Q    When you said that Mr. Ortega would call

4    you to tell you to get off the system for a

5    second, why would he need to tell you that?

6            MS. CAGNET-MYRON:  Object to form.

7        A    I have no idea.

8        Q    Do you know if it had anything to do with

9    maintaining the network?

10       A    If Ramon said get off, he is the I.T.

11   person, I got off.

12       Q    Did Ramon have any autonomy about how he

13   maintained the network system, in terms of was

14   there anyone micro managing him or telling him how

15   to maintain?

16       A    None whatsoever.

17       Q    It was his sole decision how to maintain

18   that?

19       A    Correct.

20       Q    The company wouldn't know if it required

21   time outside the work hours from 7:00 to 4:00 to

22   maintain a network?

23           MS. RICKE:  Object to form.

24           MS. CAGNET-MYRON:  Object to form.

25       A    Repeat the question.

1    Q    I was trying to ask.  So the company

2  wouldn't know if Mr. Ortega was maintaining a

3  network outside the normal business hours?

4    A    I would not know.

5    Q    Is there any way that the company would

6  have known?  Is there any records that the company

7  would possibly have?

8    A    I don't know that either.

9    Q    When you mentioned that he had remote

10  access, did the company have records with regard

11  to remote access?

12    A    Yes.

13    Q    How would those be maintained?

14    A    Direct record.

15    Q    The record, how would the records be

16  maintained?

17    A    They get issued a special access.  So the

18  company has remote access the same way I do.

19    Q    I understand.  I am talking about in terms

20  of -- I am trying to understand if there was a

21  time log of some kind.

22    A    I don't know.

23    Q    Would there be records with Bel Fuse that

24  would show the times that anyone would log-in to

25  remote access?

```
 1    A    I don't know that either.
 2    Q    Do you know how Mr. Ortega was discharged?
 3         MS. CAGNET-MYRON:  Object to form.
 4         MS. RICKE:  Objection.
 5    A    How what?
 6    Q    How Mr. Ortega was discharged from
 7   employment.  I am asking you the company in
 8   particular if human resources want to --
 9         ANSWER BY MS. BARO:  He actually
10   resigned.
11    Q    What were the circumstances of his
12   resignation?
13    A    He turned in a resignation letter.
14    Q    The company didn't have any reason to have
15   him resign or something?
16         MS. CAGNET-MYRON:  Object to form.
17    A    No.
18    Q    From the company's knowledge, he just
19   retired essentially is what you are trying to get
20   at.  He quit on his own?
21    A    He resigned.
22    Q    Earlier there was filed what we call
23   statement of claim and Mr. Ortega said he worked
24   15 hours of overtime.  I know I asked you
25   questions earlier about how much he was working
```

1   outside of his hours.  Would there be any -- I

2   want to ask the company, if it has any evidence or

3   reason to believe that he was working less than 50

4   hours -- let me rephrase that.  Less than 55 hours

5   a week?  Did you understand that question?

6        MS. CAGNET-MYRON:  Object to form.

7   Q    It was a little bit compound question.  I

8   am trying to ask.  Does the company have any

9   knowledge or reason to believe that he worked for

10  less than 55 hours per week?

11  A    In my opinion, no.  That is my opinion,

12  no.

13  Q    Did the company have anything like records

14  or anything like evidence to indicate that he

15  worked less than 55 hours per week?

16  A    He worked 7:00 to 4:00.  Never or very

17  seldom did Ramon stay past 4:00.  That is what I

18  can tell you.  He was like a clock.  Maybe less

19  than 40.

20       ANSWER BY MS. BARO:  Sometimes he would

21  leave early, sometimes because of his ride, his

22  carpool.

23  Q    I am going to characterize what you just

24  said and tell me if it's correct or not.  There's

25  nothing that would evidence the times that he

1    would work, but you would see him as employees you

2    would observe him leaving and being there; is that

3    correct?

4        A    Rephrase that.

5        Q    As I understand what you are saying you

6    would both observe him when he would be there; is

7    that correct how you knew he was working?

8        A    Correct.

9        Q    But you are not aware of, sitting here

10   today, of any other evidence that he worked any

11   other hours?

12       A    No.

13       Q    Do you know who would have seen his work

14   hours, his work time while he was at the office?

15       A    Me.

16       Q    Who else would have regularly saw him

17   working?

18            ANSWER BY MS. BARO:  Pretty much everyone.

19            ANSWER BY MR. FANABRIA:  He never missed a

20   day.  He was there every day.

21            ANSWER BY MS. BARO:  He was there every

22   day.

23       Q    Who worked the most with him that would

24   have observed his work time?

25            ANSWER BY MR. FANABRIA:  Me.

1    Q    I love to have a few more names.

2    A    Every day when he goes, he goes to my

3    office, and see you tomorrow.  He was very -- it

4    was a habit.

5    Q    In other words, he would check in with

6    you?

7    A    Yes, absolutely.

8    Q    And he reported to you; is that correct?

9    A    Yes.

10    Q    Did he report to anybody else?  Was there

11    any other managers?  I don't know the structure of

12    the company.  Did he have any other managers?

13    A    Not to the best of my knowledge.

14    Q    Okay.  If anything went wrong or Ramon

15    didn't do his job, would you be the one to --

16    A    Correct.

17    Q    -- get him in trouble or whatever?

18    A    No.  Don't need to get him in trouble.  I

19    would be the one that discusses the issue with

20    him.  No need to be in trouble.

21    Q    In other words, if he was a bad employee,

22    you would have been the one to correct that?

23         MS. CAGNET-MYRON:  Object to form.

24    A    Correct.

25    Q    When Bel Fuse purchased Array, did the

1    company continue doing the same type of business?

2        A    Yes.

3        Q    Were there any differences in way the

4    company did business after the purchase?

5        A    No.

6        Q    Early there was some testimony associated

7    with changed hours, was that one of the changes

8    associated -- there was a second shift, as I

9    understand your testimony?

10       A    Correct.

11       Q    Was this change as a result of the

12   purchase by Bel Fuse?

13       A    I do not believe so.

14       Q    It might have just been an independent

15   managerial decision?

16       A    Yes.

17       Q    There would have been no changes

18   observable to the general operations after the

19   purchase of Array; is that correct?

20       A    Correct.

21       Q    Who managed -- essentially who took over

22   Bill McPherson's role after the purchase of Array?

23   Was it like the stockholders and Ortega, was it

24   like an area manager, it was somebody ultimately

25   responsible kind of like an owner after the Array

1    purchase?

2         MS. HUEBER:  Object to form.

3    A    Well, we didn't have an owner, but we had

4    a general manager.

5    Q    Okay.  Who would that be?

6    A    Mark Falkingham.

7    Q    Okay.  Did Mark Falkingham, he is Bel

8    Fuse's employee; is that correct?

9    A    Yes.

10        (A break was taken.)

11   Q    So he didn't work for Array before the

12   acquisition, correct?

13   A    Correct.

14   Q    I am going to rephrase this.  He was

15   essentially Bel Fuse corporate, is that correct?

16   A    Yes, I would say Bel Fuse corporate.

17   Q    So would Carlos report to him?

18   A    Yes.

19   Q    Dose he currently work at the facility for

20   Array?

21   A    Yes.

22   Q    Did he take over Bill's office?

23   A    No.  He did not actually.  There's no one

24   there.

25   Q    Did Bill have an office?

1    A    Yes.

2    Q    Are you aware of where his personnel files

3  for any employees prior to the purchase of Array

4  would be?

5    A    Uh-huh, yes.

6    Q    Are they in the main facility?

7    A    Yes, they are in the main facility.

8    Q    Would the documents maintained by

9  McPherson have just be left there at the facility?

10   A    As far as employee files?

11   Q    Correct.

12   A    Yes, the employee files are all redeemed.

13   Q    When the purchase happened, I am just

14  trying to get a general feel for it.

15   A    Okay.

16   Q    Essentially is it's my understanding that

17  the way you are making it sound is that he left

18  and then Mark came?

19   A    Yes.  Eventually he came in as general

20  manager.

21   Q    A list of names that were provided to me.

22  I want to ask who they are and what they do and if

23  they are still with Ortega.  I am going to butcher

24  this name.

25        MS. CAGNET-MYRON:  Object.

```
 1        Q     That is fine.  I am with you.  J U V E A N
 2   E L, P E L E G R I N.  Do you know who that
 3   individual is?
 4             ANSWER BY MS. BARO:  Yes.
 5             ANSWER BY MR. FANABRIA:  Do I know who
 6   this person is?
 7        Q     What does this person do?
 8             ANSWER BY MS. BARO:  He can better and
 9   that.
10             ANSWER BY MR. FANABRIA:  What period of
11   time?
12        Q     Following the acquisition of the Array in
13   2013, beginning what did he do?
14        A     Same thing as he did before.
15   Manufacturing engineer, senior manufacturing
16   engineer was his title.
17        Q     Sorry.
18        A     His titles.  Senior manufacturing
19   engineer.
20        Q     How did he relate with Mr. Ortega?
21        A     Other than they know each other for a long
22   time.  They had mutual relations.  They worked
23   next to each other.
24        Q     So they would be able to observe
25   Mr. Ortega's work generally?
```

```
 1        A     Yes.

 2        Q     Does he still work with Bel Fuse?

 3        A     Yes.

 4        Q     Nelson Campos, what does he do for Bel

 5   Fuse?

 6        A     He is facilities maintenance.

 7        Q     Okay.  What kind of job is that?

 8        A     Support the facilities in any need of

 9   electrical issues, plumbing, machine maintenance

10   and machine troubleshooting and repair.

11        Q     Okay.  Would he ever work with Ramon?

12        A     Yes, sometimes they did.

13        Q     What would they do sometimes?

14        A     Exchange electrical knowledge.

15        Q     You make it sound like they would help

16   each other out to troubleshoot something.

17        A     Yes.

18        Q     Ruber, R U B E R, Miranda.  What did this

19   person do?

20        A     He was a planner, scheduled the jobs for

21   the machine shop area.

22        Q     Did he work -- does he still work with Bel

23   Fuse?

24        A     No.

25        Q     When did he stop leave?
```

1       ANSWER BY MS. BARO:  I think he left in

2    2012.

3       ANSWER BY MR. FANABRIA:  Yes, somewhere in

4    there.

5    Q    Anthony Pepe, P E P E, what did he do?

6    A    He was the machine shop manager.

7    Q    Does he still work with Bel Fuse?

8    A    No.

9    Q    Do you know when he left?

10   A    March.

11      ANSWER BY MS. BARO:  This year.

12      ANSWER BY MR. FANABRIA:  March this year,

13   March 15th.

14   Q    Was he there during the time the

15   acquisition?

16   A    Yes.

17      ANSWER BY MR. FANABRIA:  Yes.

18   Q    Jaime or Jamie Regius that worked.  What

19   did this person do?

20      ANSWER BY MS. BARO:  Jaime Regius?

21   Q    Yes.

22   A    He was assistant to Ramon.

23   Q    Jonathan Falco, who is this person?

24      ANSWER BY MR. FANABRIA:  He was the design

25   engineer.

```
1       Q     Does he still work with Bel Fuse?

2       A     No.

3       Q     Do you know when he left?

4       A     What?

5       Q     Do you know when he left?

6             ANSWER BY MS. BARO:  2014, I believe.

7             ANSWER BY MR. FANABRIA:  Yes.

8       Q     Willie De la pino?  Is that the name that

9   you guys recognize?

10            ANSWER BY MR. FANABRIA:  Willie De la

11  pina.

12      Q     Who is this person?

13      A     Manufacturing engineer.

14      Q     Do they still work with Bel Fuse?

15      A     No.

16      Q     Do you know when they left?

17            ANSWER BY MS. BARO:  June.

18            ANSWER BY MR. FANABRIA:  June this year.

19      Q     Are there any documents which would

20  describe Mr. Ortega's job duties other than the

21  Exhibit B that I provided?  Is the company aware

22  of any other documents that would describe list

23  job duties?

24      A     Not to my knowledge.

25            ANSWER BY MS. BARO:  No, not to my
```

1    knowledge as well.

2       Q    I am going to go through some part of the

3    answer that was provided in this case.  I am going

4    to ask you some responses that were done.  I am

5    providing you a copy, not really an exhibit just

6    so you can read through and see it.  I am still

7    going to label it.  This is just what we pulled

8    out. It's not Pacer.

9            MS. CAGNET-MYRON:  This is Exhibit C.

10           MS. HUEBER:  Yes.

11           (Plaintiff's Exhibit Number

12        C was marked by the court reporter and is

13        attached to the end of the transcript.)

14      Q    I am certainly not expecting you to

15    provide me with any legal advice or anything that

16    your attorney told you about this lawsuit.  I am

17    just wanting to ask the fact that the company

18    knows regarding a couple parts of this.  I have

19    provided this as reference.

20           The first affirmative defense on here it

21    says that Defendant Bel Fuse purchased Array on or

22    about August 19th, 2013.  And any alleged

23    damages that plaintiff claims to have suffered

24    prior to that date are not the liability of Bel

25    Fuse."

1          Are there any facts or any information

2     that you would have that would indicate that any

3     liability would not extend to Bel Fuse after this

4     purchase?

5          MS. CAGNET-MYRON:  Object to the form.

6          MS. RICKE:  Object to the form.

7     Q    You can take your time, but I do need an

8     answer at some point.

9          ANSWER BY MR. FANABRIA:  I need you to run

10    through that again.

11    Q    No problem at all.  Sometimes I think if I

12    talk and things makes sense to me in my head.

13    They don't necessarily make sense to people I am

14    talking to.  Any time at all I say anything that

15    you don't understand, please don't feel shy to ask

16    me to repeat or rephrase it.

17         What I am trying to find out, are there

18    any facts or reasons that you have as a company

19    for believing that you at the company would not be

20    liable for overtime damages based off of the

21    purchase of Array?  Does that make sense?

22         MS. CAGNET-MYRON:  Objection to form.

23         MS. RICKE:  Objection.

24         ANSWER BY MS. BARO:  Can you just one more

25    time?

1     Q    I am trying to understand the factual

2    basis behind the allegation that Bel Fuse would

3    not be liable for things that Array did.

4        ANSWER BY MS. BARO:  Okay.

5     Q    Now, I understand that you might have

6    plenty of things to say about this.  But I am

7    saying what the company knows or believes about

8    their liability associated with the purchase of

9    Array.  The answer to this question might be to

10    say that while we disclaim all liabilities of

11    personnel when we purchased the stocks or it might

12    be something like that.

13        I am trying to understand, for example, if

14    there is any reason that you the company believe

15    that you are not liable for I guess you could say

16    the sins of Array, is there any --

17        MS. CAGNET-MYRON:  Object to form.

18        MS. RICKE:  Object to form.

19        ANSWER BY MS. BARO:  I don't know.

20        ANSWER BY MR. FANABRIA:  I don't know.

21        ANSWER BY MS. BARO:  I would not know how

22    to.

23        ANSWER BY MR. FANABRIA:  I wouldn't have

24    the privilege of that information.  I don't know.

25     Q    Let's skip then to what is labeled as the

56

1    fifth defense on the fourth page that we have
2    here.  I want to ask, you are claiming that
3    Mr. Ortega is a professional.  Do you know any
4    facts associated with why you believe he is a
5    professional?
6         MS. RICKE:  Object to form.
7         MS. CAGNET-MYRON:  Object to form.
8         ANSWER BY MS. BARO:  His performance.
9    What job he was hired to do?
10    Q    Is there a reason that you are asserting
11    that that the job required advanced knowledge?
12        MS. RICKE:  Object to form.
13        MS. CAGNET-MYRON:  Object to form.
14        ANSWER BY MR. FANABRIA:  What do you call
15    advanced knowledge?
16    Q    I am just asking if you have anything
17    about that.  If you don't understand what that
18    means or you can't correlate it, that is fine.
19        ANSWER BY MR. FANABRIA:  I don't
20    understand.
21    Q    Were there any overtime -- I am going to
22    come back in a second.  Were there any employees
23    at Bel Fuse during the time that we are talking
24    about August 2013 until I think it was 2014 when
25    Mr. Ortega left, that were paid overtime or -- do

1    you know?

2          ANSWER BY MR. FANABRIA:  Every hourly

3    employee, every person on the line works past

4    overtime time they clock, that is registered, they

5    get paid whatever hours over 40 they work.

6      Q    So what would be the job titles that

7    people that would be --

8      A    Production assembly, machine operators,

9    things like that.

10     Q    So they have a clock that they would clock

11   in?

12     A    Correct.

13     Q    And they would -- and this was recorded

14   by?

15     A    The system.

16     Q    And who would pull the hours -- the data

17   in the clock?

18          ANSWER BY MS. BARO:  The clock would

19   automatically pull.  It was set up to

20   automatically pull it.

21     Q    And this was in the general report?

22          ANSWER BY MS. BARO:  Yes, time sheets.

23     Q    And who would prepare that and make a

24   payment?

25     A    I would do payroll.

1       Q     So you individually?

2       A     Uh-huh.

3       Q     So you are saying you would review the

4    clock data?

5       A     Correct.  For each hourly employee.

6       Q     Okay.  I might be done.  I just need

7    giving me about two to three minutes to collect my

8    thoughts and take a little mini break and open up

9    the door.  I will come back in.  And I think I am

10   wrapping up.

11            (A break was taken.)

12            MS. HUEBER:  I think I asked everything I

13   care to ask about.  If my opposing counsel would

14   like to ask any questions.

15            MS. CAGNET-MYRON:  Do you want to go

16   first?

17            MS. RICKE:  I just have a few questions.

18   First this is directed to Leticia.

19            ANSWER BY MS. BARO:  October.

20                   EXAMINATION

21   BY MS. RICKE:

22      Q     Are you aware if due diligence was

23   conducted before the purchase of Array Connecting

24   Corporation by Bel Fuse?

25      A     Am I aware?  No.

1    Q    Are you unaware or are you saying no, it

2  was not conducted?

3    A    I am unaware.

4    Q    And then regarding the human resources

5  policies of Bel Fuse?

6    A    Uh-huh.

7    Q    Was there an employee handbook that Array

8  Connecting Corporation Had?

9    A    Yes.

10        MS. CAGNET-MYRON:  Object to form.

11    Q    Are those policies that Array Connector

12  Corporation had similar to the policies that Bel

13  Fuse now have?

14    A    Pretty similar.

15    Q    Can you describe any differences?

16    A    Well, I know that -- I don't know if this

17  is considered policy, with vacations or time off

18  are a lot more generous than Bel Fuses.

19    Q    Regarding timekeeping records, are they

20  the same?

21    A    Yes, yes.

22    Q    In regarding any reporting of a suspected

23  violation of any timekeeping records, is that the

24  same as well?

25    A    That would be the same.

```
 1        Q     Okay.  And then Carlos, hi?
 2              ANSWER BY MR. FANABRIA:  Yes.
 3        Q     By went over Exhibit B.  That was the job
 4   description provided to Mr. Ortega.
 5        A     Uh-huh.
 6        Q     And you said that job description was
 7   accurate during his time with Bel Fuse?
 8        A     Correct.
 9        Q     Is that job description also accurate as
10   to Mr. Ortega's job description prior to the
11   purchase with Array Connector Corporation?
12        A     Correct.
13              MS. RICKE:  That is all I have.  Thank
14   you.
15                    EXAMINATION
16   BY MS. CAGNET-MYRON:
17        Q     I just have one follow-up question for
18   Leticia.  Are you aware of any knowledge that the
19   representative of the company regarding time logs
20   for hours and things like that for regarding the
21   plaintiff's time logs?
22              ANSWER BY MS. BARO:  As far as logging in
23   computers?
24        Q     Time logs, we discussed earlier.  Do you
25   know if there are any documents at this time
```

1     showing a time log for the plaintiff?

2          A     No.

3          Q     There are no documents at this time?

4          A     There would be no documents.

5          Q     Okay.

6                MS. CAGNET-MYRON:  I have no questions.

7                MS. HUEBER:  Thank you.  No follow-up.

8                MS. CAGNET-MYRON:  We will read it.

9                (Ending time:  12:25 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    CERTIFICATE OF OATH
 3
 4    STATE OF FLORIDA    )
                          ) SS:
 5    COUNTY OF MIAMI-DADE)
 6
 7          I, ROCHEL ALBERT, Certified Shorthand
 8   Reporter and Notary Public in and for the State of
 9   Florida at Large, certify that the witness,
10   personally appeared before me and was duly sworn.
11
12          WITNESS my hand and official seal this
13    17th day of November, 2015.
14
15    _____
16          ROCHEL ALBERT, CSR
             Notary Public, State of
17           Florida
18
19
20
21
22
23
24
25
```

1

2                    REPORTER'S DEPOSITION CERTIFICATE

3

4          I, ROCHEL ALBERT, Certified Shorthand

5    Reporter, certify that I was authorized to and did

6    stenographically report the foregoing deposition;

7    that the foregoing transcript of said witness is a

8    true and complete record of my stenographic notes of

9    the deposition by said witness; and that this

10   computer-assisted transcript was prepared under my

11   supervision.

12         I further certify that I am not a

13   relative, employee, attorney or counsel of any of

14   the parties, nor am I a relative or employee of any

15   of the parties, attorney or counsel connected with

16   the action.

17         DATED this 17th day of November, 2015.

18

19

20   _____

21   ROCHEL ALBERT, CSR
     Notary Public, State of Florida
22   at Large.  My commission expires.
     September 4, 2017.  Bonded
23   through Budget Notary Services
     Commission Number FF 049654

24

25

1　　　　　　　　　CORRECTION SHEET

2　　　RE: ORTEGA V. BEL FUSE.
　　　　CASE NO. 15-21229-CIV-ALTONAGA/O'SULLIVAN
3　　　DEPOSITION OF: LETICIA BARO AND
　　　　CARLOS FANABRIA
4　　　DATE TAKEN:  September 2, 2015

5　　PAGE/LINE NO:　　　　CORRECTION OR CHANGE

6　　_____

7　　_____

8　　_____

9　　_____

10　_____

11　_____

12　_____

13　_____

14　_____

15　_____

16　_____

17　_____

18

19　　　　_____

20　　　　　　　　WITNESS

21　　　　Sworn to and subscribed to before me this
　　___ day of _____, 2015.

22

23　_____
　　Notary Public in and for the
24　State of Florida at Large.

25

```
 1              DEPO EXPRESS REPORTING, INC.
                   1240 N.E. 176 Street
 2              North Miami Beach, Florida 33162
                      (305) 305-3333
 3

 4      November 17, 2015

 5      To:   LETICIA BARO AND CARLOS FANABRIA c/o
              Stephanie Cagnet Myron, Esq.
 6            101 North Point Park West
              Palm Beach, Florida 33407-1914
 7

 8

 9            RE: ORTEGA V. BEL FUSE.
              CASE NO. 15-21229-CIV-ALTONAGA/O'SULLIVAN
10            DEPOSITION OF: LETICIA BARO AND
              CARLOS FANABRIA
11            DATE TAKEN:  September 2, 2015

12
        Dear LETICIA BARO AND CARLOS FANABRIA,
13
        Your transcript from the above-referenced case is
14      ready to be read and signed by you.

15      Please contact my office to make arrangements at
        your earliest convenience to make an appointment
16      to read and sign your original transcript.
        The original transcript will be forwarded to the
17      attorney who ordered it in 15 days or at the time
        of trial, whichever comes first, with or without
18      your signature.

19      Your prompt attention to this matter is greatly
        appreciated.
20

21
        Sincerely,
22

23      Rochel Albert, Court Reporter
        Depo Express Reporting
24

25
```