UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

RAMON ORTEGA,

      Plaintiff,

v.

BEL FUSE, INC., *et al.*,

      Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on Bel Fuse, Inc.'s ("Bel Fuse['s]") Amended Motion for Summary Judgment ("Amended Motion") [ECF No. 98], filed on March 9, 2016. Bel Fuse requests summary judgment on Plaintiff, Ramon Ortega's claim for unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. section 207 ("FLSA"), asserted in Count II of the Amended Complaint [ECF No. 41]. Defendant advances three reasons it is entitled to judgment: the learned professional exemption to the FLSA's overtime provisions contained in 29 U.S.C. section 213(a)(1), as alleged in its fifth affirmative defense (*see* Answer 4 [ECF No. 49]); the computer employee exemption found in 29 U.S.C. section 213(a)(17), as alleged in its ninth affirmative defense (*see id.* 5); and the combined exemption recognized in 29 C.F.R. section 541.708. (*See* Am. Mot.). Bel Fuse's Amended Motion is not accompanied by a "statement of material facts as to which it is contended that there does not exist a genuine issue to be tried," "supported by specific references" to the record and consisting "of separately numbered paragraphs," as is required by Local Rule 56.1(a). Rather, the Amended Motion appears to refer back to an earlier filing, Defendant's Statement of Undisputed

Material Facts ("Def.'s SMF") [ECF No. 61], submitted on November 17, 2015 with Defendant's original Motion for Summary Judgment [ECF No. 60].[1]

On March 25, 2016, Plaintiff, Ramon Ortega ("Ortega"), filed a Response in Opposition . . . ("Response") [ECF No. 103] to the Amended Motion; and on April 5, 2016, an "Amended Response to Defendant Bel Fuse, Inc.'s Statemetn [sic] of Undisputed Materail [sic] Facts [D.E. 61]"[2] ("Pl.'s Am. SMF") [ECF No. 109]. The Court ordered Plaintiff to file an amended SMF after a review of his initial one showed it was largely unsupported by citations to the record. (*See* Order [ECF No. 108]). Yet, the Amended SMF is hardly better than the one stricken (*see* Statement . . . [ECF No. 104]), being replete with attorney argument and a discussion of computers and computer-related tasks without any support in the record. In any event, and with a trial date fast approaching, the Court has endeavored to make sense of the parties' deficient filings.

Ortega's position in his first Opposition to Defendant Bel Fuse, Inc.'s Motion for Summary Judgment [ECF No. 65], was to admit all facts asserted by Defendant as "true" with the exception of "Fact # 18," which he — ironically — maintained was not supported by a citation to the record. (*Id.* 1). In that first Opposition, Ortega also offered "Supplemental Facts,"

---

[1] The initial Motion for Summary Judgment was denied by Order dated January 19, 2016 [ECF No. 77], given Defendants' filing of a Joint Defense Motion for Judgment on the Pleadings and/or Motion to Dismiss . . . ("Motion for Judgment on the Pleadings") [ECF No. 74] presented on January 15, 2016. In a February 10, 2016 Order [ECF No. 88], the Court granted in part the Motion for Judgment on the Pleadings, dismissing Ortega's FLSA claims arising prior to October 31, 2013, and dismissing Co-Defendant Bill McPherson. The only claims at issue are Ortega's FLSA claims from November 1, 2013 to March 18, 2014. (*See id.* 9). Co-Defendant, Array Connector Corporation ("Array"), thereafter settled the case (*see* Notice of Partial Settlement [ECF No. 93]), and the only remaining Defendant, Bel Fuse, was instructed, by Order dated March 3, 2016 [ECF No. 97] to re-brief any renewed motion for summary judgment in light of the findings contained in the February 10, 2016 Order. Hence, the present Amended Motion.

[2] "Spell-checker" is "a computer program that identifies possible misspellings in a block of text by comparing the text with a database of accepted spellings." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/spell-checker (last visited Apr. 19, 2016).

highlighting some of his work duties to counteract Bel Fuse's "one-sided way" of presenting the largely undisputed facts.   (*Id.*; *see also id.* 2).   In the present Plaintiff's Amended SMF, Ortega specifically denies many of the same facts he earlier admitted as undisputed, at times — but not always — with citations to depositions appearing in the record.   (*See generally* Pl.'s Am. SMF).

On April 15, 2016, Bel Fuse filed its Reply to Amended Opposition (D.E. 109) ("Reply") [ECF No. 110].   The Reply, in truth, is an untimely reply to Ortega's March 25, 2016 Response, rather than a reply to the later Amended SMF.   Nonetheless, the Court has considered the untimely Reply.

## I.      BACKGROUND

Plaintiff began his employment in the position of IT Manager with Defendant Array, and continued with the same duties and position when Bel Fuse acquired Array through purchase in August 2013.   (*See* Def.'s SMF ¶¶ 3, 15, 16).   Bel Fuse is a global corporation that employs more than 5,000 people around the world.   (*See* Handbook [ECF No. 63-3]).   Ortega worked for Bel Fuse as an Information Technology Manager and/or Network Administrator/Engineer II ("IT Manager") from August 2013 to March 2014.   (*See* Def.'s SMF ¶¶ 4, 6, 27).

According to Bel Fuse, Plaintiff's educational background includes the following qualifications:

- Electrical Engineer (degree equivalent is a bachelor of science in electrical engineering) in 1981 from Camagüey University in Cuba;
- Graduate in programming for Windows Visual Basic in 1995 from Camagüey University;
- Graduate in Electronic Tensometry from the University of Havana in 1983;
- Graduate in Electrical Equipment Assembly from "Politecnical Institute" in Cuba in 1979; and
- Graduate in Lathe Operating from Las Tunas "Politecnical Institute" in Cuba in 1972.

(*See id.* ¶ 1).   Further, Defendant describes Plaintiff's education as including courses in computer science, covering the operation of computer hardware and software.   (*See id.*).   Last, Defendant

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

states in an earlier six-year position, Ortega repaired, maintained, and installed PCs, as well as installed and configured software for PCs. (*See id.*).

Ortega disputes these descriptions of his qualifications. (*See* Pl.'s Am. SMF). He states he had no specialized training for his main duties and no training in the software Bel Fuse used. (*See id.* ¶ 1). He makes many other unsupported statements in paragraph one of his Amended SMF that are not repeated here.

The relevant requirements for the position with Array, as stated in the job description included: "AA Degree or equivalent technical training and/or experience, Microsoft Certified Professional desired; Minimum of 5 years related experience; Thorough knowledge of Windows NT 4.0 or greater; Comprehensive knowledge of networking hardware such as bridges, routers, gateways, PC's, switched, and multi-line phone systems; Working knowledge of UNIX . . . ." (Def.'s SMF ¶ 5 (alterations added; citing Def. Ex. 5, 2 [ECF No. 62-5])). Plaintiff's responsibilities, summarized in the job description, were described as: "Manages and coordinates the company data and voice communications network and related functions to include PCs, terminals and telephones, cable installation, network system planning, monitoring, testing and servicing." (*Id.* (quoting Ex. 5, 1)). While Ortega denies the duties in the job description were "descriptive of the position, or required for the position" that he held (Pl.'s Am. SMF), he provides no citations in support. Additionally, according to the job description, Ortega's acknowledged responsibilities involved:

- Making recommendations for purchase or upgrade of data and voice networks.
- Ensuring the proper installation and maintenance of network-based software.
- Establishing and ensuring full tape backup of all file servers.
- Identifying and implementing enhancements to the Array Connector Corporation network.
- Providing and coordinating company operating system (Visual) support and maintenance.

4

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

(*See* Def.'s Ex. 5, 1).

At his deposition (*see* Deposition of Ramon Ortega ("Ortega Dep.") [ECF No. 62-3]) and in Answers to Interrogatories [ECF No. 62-4], Plaintiff elaborated on his duties and responsibilities as IT Manager as follows:

- Managing and coordinating the company data and voice communications network and related functions to include PCs, terminals and telephones, cable installation, network system planning, and monitoring, testing, and servicing (*see* Def.'s SMF ¶ 7 (citations omitted));
- Installing programs such as CAD, auto CAD, Microsoft Office, Adobe Acrobat Professional and other software on computers (*see id.* ¶ 9 (citations omitted));
- Analyzing and diagnosing problems with security cameras, including issues with the DVR, safety box, and tapes (*see id.* ¶ 10 (citation omitted));
- Implementing a bar code system for work orders, troubleshooting, analyzing and solving problems related to the system; linking the bar code with Visual Manufacturing and the punch clock (s*ee id.* ¶ 11 (citations omitted));
- Implementing the punch clock system through the Visual Manufacturing program, and troubleshooting all problems with the clock, including software problems (*see id.* ¶ 12 (citations omitted));
- Analyzing, diagnosing, and resolving virus issues (*see id.* ¶ 13 (citation omitted));
- Responding to help desk requests from employees to perform trouble-shooting services (*see id.* ¶ 17 (citations omitted));
- Maintaining and changing electronic keypad access to facilities (*see id.* ¶ 17 (citations omitted));
- Being in charge of everything with the network, including control of Bel Fuse's database, email, email server, camera, security cameras, help desk, alarm system, and everything having to do with electricity (*see id.* ¶ 19 (citation omitted));
- Administering the email server and file server, and being in charge of software and handling backups of servers (*see id.* ¶ 20 (citations omitted);
- Testing the system and network to make sure they were running properly (*see id.* ¶ 22 (citation omitted)).

To the foregoing descriptions, Plaintiff largely offers denials.  (*See* Pl.'s Am. SMF).  Bel Fuse correctly notes in its Reply "Plaintiff's 'analysis' of Plaintiff's own duties, including explanations as to the inner-workings of programs, are not supporting [sic] by any expert testimony or citation to record."  (Reply 2).  For example, Ortega denies his position required monitoring, testing and servicing — other than keeping two Wi-Fi routers working.  (*See id.* ¶ 7).  He denies "the position required network system planning, as to any meaning of the term past

5

connecting devices to a network" (*id.*), without citation to the record.   He denies he used on-the-job training, self-study, and knowledge of any special kind to install standard software like Word, by referencing his deposition testimony that "his big duties all the time was [sic] network administrator.   I didn't have any skill about that."   (*Id.* ¶ 9 (citing Ortega Dep. 8:9–15)).   Ortega states he installed software illegally and was unable to work around software that was regulated, and he did not produce or develop software, but rather cut and pasted data onto an Excel spreadsheet — what his attorney describes as Defendant's notion of "computer programming." (*Id.* (citing Deposition of Leticia Baro and Carlos Fanabria ("Baro & Fanabria Dep.") 24:5–25; 25:1–6 [ECF No. 65-1])).

With regard to the tasks involving security cameras, Ortega describes his job as making sure the security cameras were recording, and locking and unlocking the box where tapes were kept.   (*Id.* ¶ 10 (citing Ortega Dep. 38:1–13)).   As to Bel Fuse's description of his work with the bar code, punch clock, and Visual Manufacturing, Ortega points to evidence showing he merely installed software and copied information from the software onto an Excel Spreadsheet.   (*See id.* ¶ 11 (citing Baro & Fanabria Dep. 22:17–25, 23:1–25, 24:1–20)).   On the issue of the punch clock and troubleshooting software problems, as described by Bel Fuse, Ortega emphasizes he punched the clock an hour forward or backward to account for changes to daylight savings; the clock ran itself automatically. (*See id.* ¶ 12 (citing Baro & Fanabria Dep. 57:10–20; Ortega Dep. 42:14–25, 43:1–9)).   As to the handling of virus issues, Ortega offers attorney argument, unsupported by reference to the record, that he was not coding firewalls but merely running commercial anti-virus software "anyone could run."  (*Id.* ¶ 13).

With regard to Bel Fuse's assertion he responded to help desk requests from employees to perform trouble-shooting services and maintained and changed the electronic keypad access to

the facilities, Ortega insists these are "mischaracterizations of testimony and duties to make Plaintiff sound exempt.  Properly characterized, it should say that Plaintiff backed up the server, which means he made copies of the network, which again requires software and not special training."  (*Id.* ¶ 17 (citations omitted)).   Ortega also says, through attorney argument, he "checked whether the security cameras and the Wi-Fi worked, requested keys for new employees and kept track of who had them (which has nothing to do with the claimed exemptions), took questions from employees who could not figure out how to install their printers or use Microsoft Office, and looked stuff up in a database."  (*Id.*).

Concerning Bel Fuse's assertion Ortega was in charge of everything having to do with the network, including control of Bel Fuse's database, email, email server, camera, security cameras, help desk, alarm system, and everything having to do with electricity (*see* Def.'s SMF ¶ 19), Ortega insists this description mischaracterizes the testimony, as though Ortega activating the alarm system, checking to see if the security cameras were on, and assigning employees email addresses made him in charge of everything that ran on electricity (*see* Pl.'s Am. SMF ¶ 19).   Ortega explains Nelson Campos was in charge of electrical issues, including trouble-shooting; Juvean El Pelegrin was the senior manufacturing engineer; and Jonathan Falco was design engineer.  (*See id.* (citations omitted)).   According to Ortega's attorney's argument, appearing in Plaintiff's Amended SMF, "there were a lot of persons with engineer titles in charge of the [sic] what the Defendants [sic] are trying to give Plaintiff credit for."  (*Id.*).   Further, Ortega insists being in charge of a security camera or alarm system is irrelevant to application of the exemptions Bel Fuse is claiming.  (*See id.*).

As to Bel Fuse's assertion Ortega administered the email server and file server, and was in charge of software and handling backups of servers (*see* Def.'s SMF ¶ 20), Ortega explains to

put his testimony its proper context signifies he did menial labor, like making copies of hard drives, handling the Windows Exchange Server for email (which just means he installed Office's Network software and opened an account), and assigned logins for people to use their computers; tasks Plaintiff's attorney — not Ortega himself — describes as those a secretary could do (*see* Pl.'s Am. SMF ¶ 20 (citing Ortega Dep. 8:9–22; 9:5–25; 10:1–2; 20:22–25; 21:1–25; 23:1–2)). Last, with regard to Bel Fuse characterizing Ortega's role to consist of testing the system and network to make sure they were running properly (*see* Def.'s SMF ¶ 22), Ortega cites to various pages of his deposition to show this really means he "knew if everything that involved a computer stopped working," a fact "anyone working on a computer at the business" would know (Pl.'s Am. SMF ¶ 22 (citations omitted)).

According to Bel Fuse, but denied by Plaintiff, during his employment, Ortega used his knowledge from on-the-job training, as well as self-study, to perform the duties for his position. (*See* Def.'s SMF ¶¶ 8, 22 (citations omitted); Pl.'s Am. SMF ¶¶ 8, 22 (citations omitted)).  Bel Fuse states Ortega was free to exercise independent discretion relating to the duties (*see* Def.'s SMF ¶ 8 (citation omitted)), a fact Ortega disputes, highlighting instances where his recommendations and objections were not always heeded by his employer, who insisted Ortega pirate software (*see* Pl.'s Am. SMF ¶ 8 (citations omitted)).

Defendant states during his employment at Bel Fuse, Ortega worked from 7:00 a.m. until approximately 3:30 or 4:00 p.m., a schedule of nine hours per day, five times per week, Monday through Friday.  (*See* Def.s' SMF ¶ 32).  Ortega disagrees.  (*See* Pl.'s Am. SMF ¶ 32).  During the period relevant to the claims remaining in this lawsuit, Bel Fuse states Ortega was paid a biweekly salary.  (*See* Def.'s SMF ¶¶ 24–25).  Ortega disagrees.  (*See* Pl.'s Am. SMF ¶¶ 24–25). While working for Array, in 2012, Ortega earned $44,422.00; in 2013, he earned $54,999.88;

and during the period he worked in 2014, he earned $15,396.00. (*See* Def.'s SMF ¶¶ 27–29). Although Ortega may have worked different numbers of hours per week, sometimes working 30 hours, and other times working 60, Bel Fuse says he was always paid the same amount weekly. (*See id.* ¶¶ 24, 30). Plaintiff denies this in part. (*See* Pl.'s Am. SMF ¶ 24).

On June 3, 2015, Ortega filed an Amended Complaint, alleging in Count II federal overtime wage violations against Bel Fuse. (*See* Am. Compl. ¶¶ 21–32). Bel Fuse contends Plaintiff is not entitled to overtime pay because Ortega falls within the FLSA exemption categories of learned professional; computer employee; and/or a combination of both exemptions. (*See* Am. Mot. 9, 12, 16). Ortega objects, insisting he is not an exempt employee under the FLSA. (*See generally* Resp.).

## II.   ANALYSIS

### A.   Standards of Review

Summary judgment may be rendered only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a), (c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks

omitted)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. July 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (alterations and internal quotation marks omitted)).  "[T]he plain language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting *Celotex*, 477 U.S. at 322 (alterations and internal quotation marks omitted)).

The FLSA requires employers to pay workers at least the minimum wage for each hour worked, and overtime compensation when an employee works more than forty hours in a week, unless the employee is exempt.  *See* 29 U.S.C. § 207.  The FLSA recognizes certain categories of exempt employees who are not entitled to recover overtime compensation for hours worked in excess of forty hours.  *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009).  "A defendant may prevail on a motion for summary [judgment] on an affirmative defense, such as an entitlement to an exemption under the FLSA, when it has produced credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."  *Watkins v. City of*

*Montgomery*, 919 F. Supp. 1254, 1256–57 (M. D. Ala. 2013) (alteration added; internal quotation marks and citation omitted).

The determination whether an employee's job qualifies as exempt from federal wage laws is a question of law to be resolved by the courts. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).  But when the underlying facts are in dispute, "[t]he exemption question under the FLSA is a mixed question of law and fact." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (alteration added; internal quotation marks and citation omitted).  To be clear, "[t]he question of how the [employee] spent [his] working time . . . is a question of fact . . . [while] [t]he question whether [his] particular activities excluded [him] from the overtime benefits of he FLSA is a question of law . . . governed by the pertinent regulations promulgated by the Wage and Hour Administrator." *Icicle Seafoods, Inc.*, 475 U.S. at 714 (alterations added; citation omitted).

Under the FLSA, an exemption is "applied only to those clearly and unmistakably within the terms and spirit of the exemption." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008) (quoting *Brock v. Norman's Country Market*, 835 F.2d 823, 826 (11th Cir. 1988)).  Courts must "narrowly construe exemptions to the FLSA overtime requirement." *Id.* (citations omitted).  Further, "the employer bears the burden of proving the applicability of a FLSA exemption by clear and affirmative evidence." *Gregory*, 555 F.3d at 1302 (internal quotation marks and citation omitted).

## B.      The Claimed Exemptions

The determination whether an employee qualifies for an exemption must be made "on the basis of whether the employee's salary and duties meet the requirements" of the claimed exemptions.  29 C.F.R. § 541.2.  "A job title alone is insufficient to establish the exempt status of

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

an employee." *Id.* Notwithstanding Ortega's attorney's blanket and unsupported denials in Plaintiff's Amended SMF, the salary requirement is not at issue in this case. Therefore, to qualify for the claimed exemptions and be entitled to summary judgment, Bel Fuse must show with undisputed facts that Ortega's *primary duty* was the performance of exempt work. *See* 29 C.F.R. § 541.700(a).

"Primary duty" is defined as "the principal, main, major or most important duty that the employee performs." *Id.* "Employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.* § 541.700(b). The Court's determination is "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* § 541.700(a). The Court should consider:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*

Bel Fuse argues summary judgment on Count II is proper as Plaintiff's primary duties place him within the FLSA exemption categories of learned professional; computer employee; and/or a combination of both exemptions. (*See* Mot. 9, 12, 16). The Court addresses these exemptions in turn.

### 1.    Learned Professional Exemption

The FLSA exempts from its overtime requirements "any employee in a bona fide . . . professional capacity." 29 U.S.C. § 213(a)(1) (alteration added). Employees making at least $455.00 per week qualify for the exemption so long as their primary duties meet one of two classifications: the use of advanced knowledge or the engagement in artistic or creative

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

endeavors.  29 C.F.R. § 541.300(a).  The advanced knowledge classification is at issue in Bel Fuse's fifth affirmative defense, and as stated, Ortega's deposition testimony (*see* Ortega Dep. 69-70) acknowledges the minimal weekly salary requirement is satisfied.

With regard to the advanced knowledge classification, Department of Labor regulations define what employees qualify for the "learned professional" exemption:

> (a) To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.  This primary duty test includes three elements:
>
> > (1) The employee must perform work requiring advanced knowledge;
> >
> > (2) The advanced knowledge must be in a field of science or learning; and
> >
> > (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

29 C.F.R. § 541.301(a).  As to "work requiring advanced knowledge" the regulations distinguish work requiring the "consistent exercise of discretion and judgment" from "performance of routine mental, manual, mechanical or physical work."  *Id.* § 541.301(b).  Under the regulations, "The advanced knowledge is generally use[d] . . . to analyze, interpret or make deductions from varying facts or circumstances."  *Id.* § 541.300(a)(2)(i) (alterations added).  "The regulations make clear that the advanced knowledge must not merely be held by the employee but it also must be *required* for the employee to perform the job."  *Talbott v. Lakeview Ctr., Inc.*, No. 3:06cv378/MCR/MD, 2008 WL 4525012, at *7 (N.D. Fla. Sept. 30, 2008) (emphasis in original; citing 29 C.F.R. § 541.301(a)(1)).

The third element of the learned professional primary duty test, 29 C.F.R. § 541.301(a)(3), is further explained in the regulations:

> The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized

> academic training is a standard prerequisite for entrance into the profession.  The best prima facie evidence that an employee meets this requirement is the possession of the appropriate academic degree. . . . [T]he learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes.  The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

*Id.* § 541.301(d) (alterations added).

As evidence for its position Plaintiff was a learned professional as contemplated by the regulations, Bel Fuse contends that during the applicable period of his employment, November 2013 to March 2014, Plaintiff's primary duty was the performance of work that required knowledge intellectual in nature, including testing network systems; making decisions about how to handle backups; acting as administrator of the email server; and controlling databases.  (*See* Am. Mot. 11 (citations omitted)).  This work, argues Bel Fuse, included the consistent exercise of discretion and judgment.  (*See id.*).  Bel Fuse emphasizes Plaintiff's advanced knowledge was in a field of science, customarily acquired by specialized intellectual instruction, and included courses in computer science, including the operation of databases and software.  (*See id.* (citation omitted)).  Bel Fuse reiterates the job requirements (that include related experience for 5 years and an AA degree or equivalent technical training; Microsoft Certified Professional desired; thorough knowledge of Windows NT 4.0 or greater; comprehensive knowledge of networking hardware such as bridges, routers, gateways, PCs, switches and multi-line phone systems; and working knowledge of UNIX), and argues Plaintiff's thirteen-year career experience of on-the-job training, combined with knowledge acquired by Ortega's own independent research, establish the learned professional exemption.  (*See id.* 11–12 (citations omitted)).

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

As summarized, Ortega held the title of "IT Manager and/or Network Administrator/Engineer II." (Def.'s SMF ¶ 4).   Plaintiff's duties included analyzing, troubleshooting, and testing Bel Fuse's systems networks, and developing a backup test database.  (*See id.* ¶¶ 5, 7, 9–13, 17, 19–22).  Plaintiff's responsibilities included controlling the database and backups, and handling all backups of all servers to ensure they were done correctly. (*See id.* ¶ 20).

In his Response, Plaintiff casts a wholly different light on the complexity and sophistication of his primary job duties.  Ortega highlights several points — some of these based on record evidence — that undermine Bel Fuse's position.  Construing the learned professional exemption strictly against Bel Fuse, as the Court must do, Bel Fuse has not shown Ortega qualifies for the learned professional exemption.

First, Bel Fuse does not satisfy the educational requirement to invoke the exemption.  The posted job description, as Ortega notes, requires a mere AA degree or no degree at all ("AA Degree or equivalent technical training").  (*See* Resp. 6 (citation omitted)).  And the regulations make clear "[a]dvanced knowledge cannot be attained at the high school level."  29 C.F.R. § 541.301(b) (alteration added).   On this ground alone, Bel Fuse cannot prevail on its fifth affirmative defense.  *See, e.g.*, *Dybach v. State of Fla. Dept. of Corr.*, 942 F.2d 1562, 1565 (11th Cir. 1991) ("[T]he determinative factor is the job requirement and not the education in fact acquired by the employee.  The job description of the position which Dybach occupied could have been satisfied . . . by a B.A. degree in nuclear physics, or [] in corrections, or [] in physical education, or basket weaving." (alterations added; internal quotation marks omitted)); *Clark v. Centene of Texas, L.P.*, 44 F. Supp. 3d 674, 681 (W.D. Tex. 2014) ("Even though many Plaintiffs are RNs and hold advanced degrees and certificates, the [case manager] job does not

*require* those advanced qualifications.  Because the CM job does not satisfy the education requirement, the Court need not address the parties' arguments concerning the other prongs of the primary duty test." (emphasis in original; alteration added)).

Second, the material facts concerning whether the work Ortega performed required advanced knowledge are disputed.  The thrust of Ortega's opposition to the learned professional exemption is predicated on the proposition it was not his job title or description that matters for the purposes of applying the FLSA exemption categories — it is what he actually did that matters.  (*See* Resp. 6-13); *see* 29 C.F.R. § 541.2.  And the tasks he performed, according to snippets from the depositions on file and his attorney's creative descriptions, could have been satisfied by "half the twentysomethings in America today."  (Resp. 7).

Ortega described learning much of his work on the job, including by simply "Googling" and "researching."  (Ortega Dep. 131:1–12).  The coursework he took in Cuba for his *electrical engineering* degree was completed in *1981*, and Bel Fuse provides no information on the relevance of that coursework or the Windows Visual Basic programmer course Ortega completed in Cuba in 1995 to the advanced knowledge required and applied in his work at Bel Fuse.  (*See* Def.'s SMF ¶ 1).  The relevance of Ortega's degrees in the 1970s for electrical equipment assembly and lathe operation is similarly not explained.  (*See id.*).  With regard to Bel Fuse's description of Ortega's duties as including "installation of programs such as: CAD, auto CAD, Microsoft Office, Adobe Acrobat Professional and other software" (Def.s' SMF ¶ 9), Ortega's counsel responds: "basically the Plaintiff installed software, which we all have done, especially Microsoft Office" (Resp. 11).

To many of the other tasks Bel Fuse recounts in support of application of the professional exemption, Ortega's counsel provides his own interpretation, for example: installing software

and keeping it updated simply means clicking "install update" when the bubble appears on the computer screen; installing drivers we have all done when we have ever bought a printer; operating a DVR and tapes means unlocking a box, putting a tape in it, and locking it up again; running Norton Anti-Virus is simply installing software and running the anti-virus software; and backing up a server means making copies of the network — something that requires software and not special training; activating an alarm system does not require specialized knowledge. (*See id.* 11–13). While the Court does not condone — nor do the Rules contemplate — the practice employed by Ortega's counsel of supplying disputed facts through his own unsupported commentary, Bel Fuse appears to concede some factual dispute exists concerning whether Plaintiff satisfies "the requirements for advanced knowledge as customarily acquired by a prolonged course of specialized intellectual instruction." (Reply 9).

Last, Ortega emphasizes his own deposition testimony, wherein in response to the question: "did you have any special skills or prior experience with this type of work before you worked for Array?" he stated, "For the part of electricity, yes, but it was the minor part. My duties, my big duties all the time was [sic] network administrator. I didn't have any skill about [sic] that." (Ortega Dep. 8:9–15).

In sum, the material facts are disputed with regard to whether Ortega's primary duty required advanced knowledge customarily acquired by a prolonged course of specialized intellectual instruction. To be entitled to summary judgment, Bel Fuse had the burden of showing the exemption applies by clear and affirmative undisputed evidence. Plaintiff has raised disputed facts and argument concerning the nexus between his "advanced" training and his primary duties, which Bel Fuse fails to overcome. Viewing the facts in the light most favorable to the non-moving party, and construing the exemption narrowly, as required, the Court has not

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

seen sufficient evidence demonstrating the Plaintiff's *primary duty* on a day-to-day basis was to perform the advanced level of activities required under this exemption. Consequently, summary judgment on Bel Fuse's fifth affirmative defense is denied.

2.      Computer Employee Exemption

Bel Fuse raises the computer employee exemption in its ninth affirmative defense and requests summary judgment in its favor on that ground. The FLSA exempts from its overtime requirements "any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty" is:

> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;
>
> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
>
> (D) a combination of duties described in subparagraphs (A), (B), and (C), the performance of which requires the same level of skills, and who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour . . . .

29 U.S.C. § 213(a)(17) (alteration added). Again, an employee's primary job duty, not his job title, determines whether the exemption applies. *See* 29 C.F.R. § 541.400(a).

This exemption, enacted in 1996 and found in 29 U.S.C. section 213(a)(17), broadened the coverage of computer services personnel from the prior statute, 29 U.S.C. section 213(a), and 1991 DOL regulations in three ways. *Bobadilla v. MDRC*, No. 03 Civ. 9217, 2005 WL 2044938, at *6 n.5 (S.D.N.Y. Aug. 24, 2005). Section 213(a)(17) "eliminated the requirement that the employee's work require the exercise of independent judgment and discretion." *Id.* It

18

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

"eliminated any reference to educational requirements," and it dispensed with the earlier requirement the employee must "have achieved a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge." *Id.* (internal quotations and citations omitted).

The interpretive guidelines from the Department of Labor further expand on this exemption stating that under Section 213(a)(17) of the FLSA, the exemption applies only to computer employees whose primary duty consists of:

> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
>
> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
>
> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

29 C.F.R. § 541.400(b). "The exemption for employees in computer occupations does not include employees engaged in the manufacture or repair of computer hardware and related equipment." 29 C.F.R. § 541.401. Further, "[e]mployees whose work is highly dependent upon, or facilitated by, the use of computers and computer software programs (e.g., engineers, drafters and others skilled in computer-aided design software), but who are not primarily engaged in computer systems analysis or other similarly skilled computer-related occupations" are not exempt computer professionals. *Id.* (alteration added).

Cases interpreting the computer employee exemption are instructive. In *Bobadilla*, for example, the plaintiff held a certificate issued by Cisco Systems entitling him to designation as a

Cisco Certified Network Associate; as Network Administrator he was a member of the networking team, analyzing network resources and resolving problems with the virtual network through trial and effort; and he was involved in the introduction of new backup software and server upgrades. 2005 WL 2044938 at *2, n.2, *6–7. Based on the plaintiff's own testimony and documents, the court concluded, despite Bobadilla's contention "he spent most of his time performing Help Desk functions," he "was principally of value [to the defendant] because he had sophisticated knowledge of computing that went beyond that of a non-exempt Help Desk employee." *Id.* at *7 (alteration added).

Guided by the court's reasoning in *Bobadilla*, the court in *Clarke v. JP Morgan Chase Bank, N.A.*, found one of the plaintiffs in the putative collective action, Tapas Sarkar ("Sarkar"), fell within the computer employee exemption, where he was responsible for solving company support problems through creativity, analysis, testing, and recommending solutions. No. 08-2400-CIV, 2010 WL 139778, at *17 (S.D.N.Y. March 26, 2010). Sarkar does not appear to have had a college degree; the opinion summarizes his qualifications as consisting of two technical certifications, one following a ten-month course as a Certified Novell Engineer, and another as a Microsoft Certified Systems Engineer. *See id.* at *3. Notwithstanding Sarkar's strained attempt to fit his job duties within those applicable to lower-level technology personnel, *see id.* at *19, the court found he fell "squarely within the computer employee exemption," *id.* at *17, given he consulted with users to determine hardware, software or system functional specifications; was responsible for capacity management in a region having more than 10,000 users; developed disk space remediation plans; analyzed and identified root causes of problems with the computer system and identified areas for improvement; and tested software and gave feedback to the engineering department, *see id.* at *17–18. With Sarkar's admission he was the "guru and the

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

go-to person for capacity management in the Northeast region," the court could not divine "who, other than, perhaps, a computer programmer, would" qualify for the computer employee exemption if not Sarkar.  *Id.* at *21 (internal quotations omitted).

In *Campbell v. Kannapolis City Schools Board of Education*, the plaintiff was a "Local Area Network Engineer" whose responsibilities were to monitor servers and repair network issues.  55 F. Supp. 3d 821, 823–24 (M.D.N.C. 2014).  The plaintiff in *Campbell* had the following qualifications: Certified Netware Engineer; Microsoft Certified Systems Engineer; Cisco Certified Network Professional; Sniffer Certified Professional; and four years of experience as an analyst with an employer whose network consisted of many WAN connections, about 100 servers, and 3,000 users.  *See id.* at 825.  By his own deposition testimony, the plaintiff admitted he monitored the functionality of the virtual private network and servers to ensure they operated properly, analyzed data to determine problems regarding network issues, handled connectivity issues, and generally did what was needed so users had access to the network.  *See id.* at 825–26.  The court described plaintiff as enjoying a high level of discretion in performing these tasks.  *See id.* at 826.  In analyzing his job description and responsibilities, the court also found it persuasive that according to the plaintiff, the company "counted on him for the system to be working," *id.* (internal citation and alterations omitted), and discounted the plaintiff's efforts to "recast his role as one resembling a lower-skilled employee," *id.* at 828.

In *Grills v. Hewlett-Packard Company*, the plaintiff, a Technical Solutions Consultant III, also known as a Level II engineer, had five technical certifications involving tests that required "'quite a bit of study' in order to pass."  88 F. Supp. 3d 822, 823 (N.D. Oh. 2015).  His work involved interfacing with customers, gathering data on networking issues, analyzing the data, troubleshooting and testing network issues for customers, communicating with the customer, and

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

making proposed solutions and recommendations.  *Id.*  Cases unable to be resolved by Level II engineers were elevated to Level III and Level IV engineers.  *See id.* at 824.  The plaintiff used his discretion in troubleshooting issues; and consulted with users to determine hardware, software or system functional specifications.  *See id.* at 826.  The court there found his duties involved, at least, some combination of the tasks described in 29 C.F.R. sections 541.400(1) and (2).  *See id.* at 827.

In reaching that conclusion, the court found distinguishable and unpersuasive cases such as *Martin v. Indiana Michigan Power Company*, 381 F.3d 574 (6th Cir. 2004), emphasized here by Ortega (*see* Resp. 18–19), decided under the narrower statute, 29 U.S.C. section 213(a)(1), and regulations, rather than the later-expanded computer employee exemption found in section 217(a)(17). *See Grillis*, 88 F. Supp. 3d at 830-32.  In *Martin*, the plaintiff maintained computer workstation software and did troubleshooting and repairs from his company's help desk.  *See Martin*, 381 F.3d at 577.  The plaintiff, who had no computer certifications and no degree beyond high school, spent the majority of his time physically moving workstations and computers to temporary buildings, making no autonomous recommendations or decisions in the course of his work.  *See id.* at 577–78.  The court concluded the then-existing computer exemption did not apply as plaintiff's maintenance of the computer system within predetermined parameters did not require "'theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering,'" *id.* at 581, a requirement which, as noted in *Bobadilla*, 2005 WL 2044938 at *6, n.5, was eliminated with the newer statutory exemption for computer employees found in 29 U.S.C. section 213(a)(17).  *Cf. Curry v. Natividad Med. Ctr.*, No. 5:11-CV-04662 EJD, 2013 WL 2338110 (N.D. Cal. May 28, 2013) (relied on by *Grillis*; finding plaintiff more than a help desk staffer, and subject to

computer employee exemption, where plaintiff procured hardware; maintained network infrastructure; installed lab equipment; and gave help desk personnel escalation support, including guidance and support to lower level network technicians for user issues exceeding lower level technicians' competence).

Last, in *Bergquist v. Fidelity Information Services, Inc.*, 399 F. Supp. 2d 1320, 1331 (M.D. Fla. 2005), *aff'd*, 197 F. App'x 813 (11th Cir. 2006), the court applied the computer employee exemption to the plaintiff-computer programmer who acknowledged at his deposition that he met the definition of computer programmer under the statutes and codes. In *Bergquist*, the plaintiff's primary duties involved designing programs after receiving a business design from a business analyst. *See id.* He would do intensive research to find out what technical steps were necessary to develop the program, and he was mostly not supervised. *See id.* He would also test and do ongoing maintenance of a program. *See id.*

Ortega, like the foregoing computer employees found exempt under the expanded computer employee exemption, holds multiple certificates in network administration and computer development; held the title of IT Manager and/or Network Administrator/Engineer II for a global corporation that employs more than 5,000 people around the world; and had duties consisting of analyzing, troubleshooting, and testing Bel Fuse's systems networks; and developing a back-up test database, creating a back-up software system and system upgrades. He admitted:

> I used to be in charge for everything with the network. I mean, database, email because we had an email address over there, an email server over there . . . . And Help Desk when the people don't know how to run a program or there is a failure in the computers, I have to do it, also.

(Ortega Dep. 7:20–25; 8:1 (alteration added)). Ortega explained as Network Administrator he was responsible for the following issues:

> The database, backups, administrate the software in charge of the production. The name was Visual Manufacturing. Administrator of the email server, which was Windows Exchange Server. File server. All backups of all those servers. And Help Desk and software administrator of all software running in the factory.

(*Id.* 8:19-25).

Ortega would "troubleshoot or solve problems when [the] QC instrument would break down (*id.* 20:9–13 (alteration added)); decide how best to back up the data (*id.* 21: 1–4); and assumed all the responsibility of managing a production database and two test databases as there was no one else he could go to for help with that (*id.* 23:12–21). Bel Fuse had a wireless network and two wireless routers; Ortega "was in charge of the wireless." (*Id.* at 38:23–25). While Ortega "never got the training in any of the softwares [sic]," he was responsible for installing and updating all the software Bel Fuse used, including Microsoft and "the more complicated" Visual Manufacturing updates. (*Id.* 44:5–17). With his help desk responsibilities, Ortega was "able to diagnose and determine what the issue was, whether it was a network problem, a hardware problem or a software problem" (*id.* at 46:3–7); as well as "a virus problem" (*id.* at 46:8–9). And it was Ortega who would resolve whatever the issue was. (*See id.* 46:10–14). No one had to instruct Ortega on how to test the system and network to make sure they were running properly. (*See id.* 57:12–19).

Similar to the plaintiffs in *Clarke*, 2010 WL 1379778, and *Campbell*, 55 F. Supp. 3d 821, Ortega strains, largely through his attorney's unsupported descriptions and re-characterizations of his heretofore admitted primary duties, to escape from application of the computer employee exemption. Like the court in *Clarke*, the undersigned cannot divine, who if not Bel Fuse's IT Manager/Network Administrator/Engineer II, and sole person "in charge for [sic] everything with the network" (Ortega Dep. 7:20–21), "other than, perhaps, a computer programmer, would" qualify for the computer employee exemption. *Clarke*, 2010 WL 1379778 at *21 (internal

CASE NO. 15-21229-CIV-ALTONAGA/O'Sullivan

quotations omitted).  The mostly unsupported work descriptions offered by Ortega's attorney do not create a triable issue of fact regarding how Ortega spent his working time in his capacity as IT Manager for Bel Fuse.  Consequently, the question whether his primary duties exclude him from the overtime benefits of the FLSA is a question of law the Court resolves by way of summary judgment.  *See Icicle Seafoods, Inc.*, 475 U.S. at 714.  Ortega's responsibilities, as reflected in the record, are analogous to those cited in the case law and are more than sufficient to bring him squarely within the computer employee exemption of the FLSA.

### III.    CONCLUSION

Viewing the evidence in the light most favorable to Plaintiff, summary judgment is proper on Count II of the Amended Complaint on the basis of Bel Fuse's ninth affirmative defense, the computer employee exemption.[3]  Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant, Bel Fuse, Inc.'s Amended Motion for Summary Judgment **[ECF No. 98]** is **GRANTED**.  A final summary judgment will be entered separately.

**DONE AND ORDERED** in Miami, Florida, this 20th day of April, 2016.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

[3] Given the Court finds Ortega qualifies for the computer employee exemption, the Court does not reach Bel Fuse's alternative request for summary judgment on the basis of the combined exemption.  (*See* Mot. 16–17).  "Employees who perform a combination of exempt duties as set forth in the regulations . . . for executive, administrative, professional, outside sales and computer employees may qualify for exemption. . . . In other words, work that is exempt under one section of this part will not defeat the exemption under any other section."  29 C.F.R. § 541.708 (alterations added).

25